**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **JAMES MCWHORTER,** | * | |
| **YASMIN ABADIAN,** | | |
| | * | |
| **Plaintiffs** | | |
| | * | |
| **v.** | | **Case No.: PWG-18-2452** |
| | * | |
| **BANKERS STANDARD INSURANCE** | | |
| **COMPANY,** | * | |
| | | |
| **Defendant** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

This case involves the unexpected and unfortunate loss of Plaintiffs James McWhorter and

Yasmin Abadian's second home overlooking the Chesapeake Bay. The undisputed facts show that

a pipe burst, spilling 500,000 gallons of water and causing a portion of the cliff on which the house

sat to fall into the Bay. The house was deemed unsafe and torn down. The Plaintiffs had a

homeowner's insurance policy through Defendant Bankers Standard Insurance Company and filed

a claim for their losses. Defendant denied the claim based on exclusions in the policy. Plaintiffs

brought this suit for breach of contract and for a declaratory judgment to recover their losses.

Pending before me are the parties' cross-motions for summary judgment.[1] For the reasons

explained below, summary judgment is granted in favor of the Defendant on Plaintiffs' claims for

property damage because these claims are excluded by the policy. The cross-motions for summary

---

[1] The motions are fully briefed. *See* ECF Nos. 24, 27, 30, 33. A hearing is not necessary. *See* Loc. R. 105.6 (D. Md. 2018). Also pending is Defendant's motion to strike the affidavit of Plaintiffs' expert. ECF No. 35. Plaintiffs opposed the motion. ECF No. 36. For the reasons discussed below, Defendant's motion to strike is denied.

judgment are denied for Plaintiffs' claims for personal property damage, as disputes of material fact remain regarding coverage for those claims. The Court acknowledges with regret that this is a harsh result for Plaintiffs, undoubtedly contributed to by the labyrinthine text of the Defendant's policy, but it is compelled to reach this conclusion based on the unambiguous language of the policy and the record before the Court.

## I.    Background

Plaintiffs owned a second home in Port Republic, Maryland overlooking the Chesapeake Bay (the "Property.") The back of the home was situated approximately 20 feet from the edge of a cliff above the Bay. Deposition of James McWhorter ("McWhorter Depo."), ECF No. 27-3 at 23:7–19, Bates No. 117.[2] Plaintiffs' had a homeowners' insurance policy (the "Policy") with Defendant that covered both the Property and their other home in Potomac, Maryland. Policy, ECF No. 27-2 at Bates No. 12. The Policy provides coverage limits, "extra benefits," exclusions, and, with respect to the Property, additional flood coverage, all of which are discussed further below. *See generally*, *id.*

On August 5, 2016, Mr. McWhorter received a voicemail from his neighbor notifying him that the walnut tree in their yard had disappeared. McWhorter Depo. at 26:6–14, Bates No. 118. In fact, the cliff behind the house fell into the Bay. *See* ECF No. 27-1, Bates No. 2, pictured below:

---

[2] Defendant's motion for summary judgment included 11 exhibits. *See* ECF No. 24. Plaintiffs' cross-motion for summary judgment attached all of Defendant's exhibits, added 23 additional exhibits, and Bates stamped all the exhibits. *See* ECF No. 27. For ease of reference, citations to the record are to the Bates stamped versions of the parties' exhibits.



This picture illustrates a large portion of the dirt cliff fell away from the house, leaving the house close to the edge of the cliff. *Id.*

The parties agree that slope failed because of a broken water line. *See* Report from Defendant's Expert Travis Green ("Green Report"), ECF No. 27-4 at Bates No. 194, ("[W]e believe that the cause of the landslide and resulting damage to the residence is most likely the result of a broken or damaged water pipe."); Report from Plaintiffs' Expert David Schoenwolf ("Schoenwolf Report"), ECF No. 27-5 at Bates No. 221 ("Had there been no plumbing break, in my opinion there would have been no collapse to the home and to the cliff."). Although the parties disagree about where the water line burst and the path the water flowed – issues that are discussed further below – the record indicates that approximately 500,000 gallons of water escaped from the pipe and entered the soil at some point. *See* Green Report at Bates No. 194. The saturation of the soil caused the cliff to fail. *See* Schoenwolf Report at Bates No. 220 ("The water flow reduced the strength of the soil at the existing slope and cause the slope to experience a significant amount of movement, [and] a collapse of the cliff . . . .").

The Plaintiffs reported the loss to Defendant on August 5, 2016 after they received the telephone call from their neighbor. McWhorter Depo. at 38:2–6, Bates No. 121. On August 6, 2016, the Calvert County Division of Inspections & Permits posted a notice on the house stating the building was unsafe and its use or occupancy was prohibited. ECF No. 27-12, Bates No. 494. Defendant investigated the Property on August 8 and 9, 2016. ECF No. 27-20 at Bates No. 532. On August 9, 2016, Defendant's adjuster, David Blanch, sent Plaintiffs a Reservation of Rights Letter, informing Plaintiffs that they were investigating the cause of the loss and drawing their attention to several exclusions in Plaintiffs' Policy. ECF No. 27-15, Bates No. 500.

On August 22, 2016, the Calvert County Division of Inspections & Permits sent Plaintiffs a letter informing them that the unsafe notice was posted on the Property, that a registered design professional would be required to investigate the building, and that the building would need to demolished if repairs were not practical or feasible. ECF No. 27-17, Bates No. 507. On the same day, Plaintiffs had James Scruggs evaluate the Property, who determined that it had to be demolished because the cliff was continuing to fall away. ECF No. 27-34, Bates No. 693. Plaintiffs then contracted with Mr. Scruggs to demolish the Property, which was completed over several days. *See* ECF No. 27-33, Bates No. 690; Deposition of James Scruggs ("Scruggs Depo."), ECF No. 27-30 at 52:3–8, Bates No. 602.

On October 4, 2016, Mr. Blanch sent Plaintiffs a letter denying coverage for the Property, citing several exclusions in the Policy. ECF No. 27-20, Bates No. 532. The Plaintiffs, with the assistance of counsel, requested that Defendant reconsider its denial of coverage. *See* ECF No. 27-22, Bates No. 545. On November 26, 2016, Mr. Blanch affirmed the denial of the claim. *Id.*

On July 18, 2018, Plaintiffs filed a complaint against Defendant in the Circuit Court of Montgomery County for breach of contract and for a declaratory judgment that Defendant must pay for the Property losses under the Policy. ECF No. 1. The case was removed to this Court. *Id.* Pending before me are the parties cross-motions for summary judgment and Defendant's motion to strike an affidavit of Plaintiffs' expert that was filed with the summary judgment briefing. *See* ECF Nos. 24, 27, 30, 33, 35, 36.

## II. Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* If this initial burden is met, the opposing party may not rest on the mere allegations in the complaint. *Id.* at 247–48. The opposing party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

summary judgment is appropriate.  *Anderson*, 477 U.S. at 248–49.  On a motion for summary judgment, the facts are considered in the light most favorable to the non-moving party, drawing all justifiable inferences in his favor.  *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009).

## III.  Analysis

There are four potential bases for coverage under the Policy: (1) Dwelling Coverage; (2) the Special Exception Rule for Escaping Water; (3) Extra Benefits for Collapse or Land Restoration; and (4) the Flood/Surface Water Coverage Endorsement.  I first discuss principles of insurance coverage under Maryland law then discuss each potential basis for coverage.

### a.  Insurance coverage under Maryland Law

In Maryland, "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts . . . ."  *Mitchell v. AARP Life Ins. Program, New York Life Ins. Co.*, 779 A.2d 1061, 1069 (Md. Ct. Spec. App. 2001) (citing *Philadelphia Indem. Ins. Co. v. Maryland Yacht Club, Inc.*, 742 A.2d 79 (1999)).  Therefore "[i]nsurance policies, like other contracts, are construed as a whole to determine the parties' intentions."  *Id.* (internal quotation marks omitted).  Maryland courts "utilize the law of objective interpretation to ascertain the intent of the contracting parties, provided that intention does not violate an established principle of law."  *Id.*

"When the language of a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court."  *Id.* (internal quotation marks omitted).  "A contract is ambiguous if, 'when read by a reasonably prudent person, it is susceptible of more than one meaning.'"  *United Servs. Auto. Ass'n v. Riley*, 899 A.2d 819, 833 (2006) (quoting *Calomiris v. Woods*, 727 A.2d 358, 363 (1999).  "Unlike the majority of other states, Maryland does not follow the rule that insurance policies are to be most strongly construed against

the insurer." *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 699 A.2d 482, 494 (1997). Nonetheless, "under general principles of contract construction, if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument.*" *Id.* (emphasis in original).

Maryland courts have long applied the "efficient proximate cause" rule to determine the cause of a loss under an insurance contract. *See Hartford Steam Boiler Inspection & Ins. Co. v. Henry Sonneborn & Co.*, 54 A. 610, 612 (1903) ("[C]ourts adopt the practical rule that the efficient and predominating cause in producing a given event or effect, though there may be subordinate and dependent causes in operation, must be looked to in determining the rights and liabilities of the parties concerned."). If the parties intend to exclude losses by particular causes, "they must do so by plain and unambiguous terms." *Id.* Therefore the parties are free to abrogate the efficient proximate cause rule and contract for no coverage of losses if an excluded cause of the loss falls anywhere along the chain of causation. Such contract terms are commonly known as anti-concurrent causation ("ACC") clauses and may take the form of contract language expressly stating the losses are not covered if caused "directly or indirectly" by excluded perils. *See Bao v. Liberty Mut. Fire Ins. Co.*, 535 F. Supp. 2d 532, 541 (D. Md. 2008).

Given the potentially dramatic effect of such clauses, Maryland requires insurance companies to provide annual notice to their customers when their insurance coverage contains an ACC clause. *See* Md. Code, Ins. § 19-215 (requiring insurer that issues a homeowner's insurance policy that contains an ACC clause to provide annual notice to the customer that "(1) is clear and specific; (2) describes the ACC clause; (3) informs the insured to read the policy for complete information on the exclusions; and (4) states that the insured should communicate with the insurance producer or the insurer for additional information regarding the scope of the

exclusions.")  Courts have honored ACC clauses in insurance policies as the agreed-upon terms of the contract under Maryland law.  *See, e.g.*, *Bao v. Liberty Mut. Fire Ins. Co.*, 535 F. Supp. 2d 532, 539–40 (D. Md. 2008); *Nationwide Mut. Ins. Co. v. Nash*, No. RDB-07-209, 2007 WL 1774487, at *11 (D. Md. June 18, 2007); *N. Assur. Co. of Am. v. EDP Floors, Inc.*, 533 A.2d 682, 688–89 (1987).

With these principles in mind, I turn to Plaintiffs' alleged bases for coverage under their Policy with Defendant.

### b.  Dwelling Coverage

The parties agree that the Policy covers "direct physical loss" to property unless an exclusion applies.  This is set out in the "Losses We Cover" and "Losses We Do Not Cover" portions of the Policy as follows:

> LOSSES WE COVER
> We cover direct physical loss to property described in Part I of this policy, subject to Losses We Do Not Cover.
>
> LOSSES WE DO NOT COVER
> We do not cover loss that is caused directly or indirectly, or which ensues from or is the result of any of the following, unless noted otherwise.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

Policy at Bates No. 36.  Notably, the "Losses We Do Not Cover" passage includes an ACC clause by specifying that the Defendant does not cover losses "caused directly or indirectly" by excluded losses "regardless of any other cause or event contributing concurrently or in any sequence to the loss."[3]  *Id.*  This ACC clause is followed by 28 enumerated exclusions, including in relevant part 1. Earth Movement, 2. Flood Or Surface Water, 10. Collapse, and 11. Gradual Deterioration.  The

---

[3] The Policy also contains a notice to the policyholder regarding the existence of this ACC clause. Policy at Bates No. 78.  Plaintiffs do not argue that Defendant failed to comply with the ACC clause notice provisions under Maryland law.

Earth Movement and Flood Or Surface Water exclusions are discussed here. The Collapse and Gradual Deterioration exclusions are discussed separately below.

### i. Earth Movement Exclusion

The Earth Movement exclusion states as follows:

**1. Earth Movement**
    a. We do not cover any loss caused by earth movement, meaning:
        (1) Earthquake, including land shock waves or tremors before, during or after a volcanic eruption;
        (2) Landslide, mudslide or mudflow;
        (3) Subsidence or sinkhole; or
        (4) Any other earth movement including earth sinking, rising or shifting.
        This exclusion **1.** applies regardless of whether any of the above, in **a.(1)** through **a.(4)**, is caused by an act of nature or is otherwise caused. However, direct loss by fire, explosion, breakage of glass which is part of a building, storm door or storm window or theft resulting from any of the above, in **a.(1)** through **a.(4)**, is covered.
    b. This exclusion does not apply to personal property.

Policy at Bates No. 36 (emphasis in original). In other words, given the effect of the lead-in ACC clause, any loss to property that is caused directly or indirectly by Earth Movement (which expansively includes a landslide, mudslide, mudflow, or other earth movement) as defined above is excluded from the Policy's coverage, except that this exclusion does not apply to Personal Property.

Here the undisputed material facts show that the loss of Plaintiffs' residence was caused, either directly or indirectly, because of Earth Movement. As pictures of the residence illustrate, the slope behind the house fell into the Chesapeake Bay, leaving the house on the edge of the cliff. *See, e.g.*, ECF No. 27-1, Bates No. 2. This qualifies at least as "any earth movement including earth sinking . . . or shifting." Policy at Bates No. 36.

Plaintiffs' expert, Mr. Schoenwolf, acknowledged that the earth moved due to landslide, subsidence, sinkhole, or shifting in his deposition:

Q: So I'm referring to Schoenwolf Exhibit 6. This is Bates label 50.

A: Okay.

Q: And we see earth movement --

A: Yeah.

Q: -- and we see four classifications -- earthquake -- including sways; tremors; before, during, or after a volcanic eruption -- can we agree that that did not occur?

A: That's right. I can agree with that.

Q: Okay. Two, landslide, mudslide, or mud flow. Did either one of those three things occur?

A: A landslide occurred here, yes.

Q: Subsidence, did that occur?

A: Yes.

Q: Did a sinkhole occur?

A: Well, again, I guess -- if you think about a sinkhole, a sinkhole or a cave formed under the foundation of that building, so the answer is yes.

Q: Okay. Did earth move via shifting?

A: Yeah. It moved all right.

Depositon of David Schoenwolf ("Schoenwolf Depo."), ECF No. 27-10 at 158:2–159:1, Bates No. 427. In his deposition, Plaintiff James McWhorter denied that a landslide or subsidence occurred, but acknowledged that the earth moved. *See* McWhorter Depo. at 81:15–82:13, 85:1–5, Bates No. 132–33. ("QUESTION: Do you disagree that the earth moved by either sinking, rising, or shifting? MR. BROWN: Objection. THE WITNESS: Well, the earth definitely moved. It did, yes."). And, in fairness, this conclusion is inescapable.

The record also shows that this earth movement was at least a direct or indirect cause of the loss. After the slope failed, the residence was directly on the edge of the cliff. *See* ECF Nos. 27-2, 27-32. The Calvert County Division of Inspections & Permits August 22, 2016 letter stated, "To eliminate the hazardous condition caused by the cliff's collapse and make this dwelling safe

for occupancy, this structure must first be investigated and evaluated by a registered design professional." ECF No. 27-17 at 1, Bates No. 507. And Mr. Scruggs determined that the building had to be demolished because it was hanging over the cliff, as he described in his deposition:

> Q: Okay. It says in here - I'm referring to the second sentence - my opinions will include the need to demolish the whole home. Is it your opinion that the whole home needed to be demolished?
>
> A: Yes, sir.
>
> Q: Why do you believe that?
>
> A: Because when I was there, the footers wasn't hanging over the cliff. When I come back a week later, they were. And there was like five to six inches underneath the footers where there was no dirt that you could see from the back of the house standing in other people's yard.

Scruggs Depo. at 31:18–32:9, Bates No. 597.

Thus the loss of the property was caused, directly or indirectly, by the earth movement that occurred when the cliff fell into the Bay. The loss of the property is therefore excluded from the Dwelling Coverage based on the Earth Movement exclusion. Accordingly, Defendant is entitled to summary judgment for claims of property loss under the Dwelling Coverage. However, the Earth Movement exclusion does not apply to loss of personal property. Those claims are discussed further below.

### ii. Flood Or Surface Water Exclusion

As noted above, the Policy also includes an exclusion for Flood or Surface Water. That exclusion states:

> **2. Flood Or Surface Water**
> a. We do not cover any loss caused by:
>> (1) Flood, surface water, water accumulated outside of a building or structure, including but not limited to standing or ponding water , run-off of water from a paved surface, driveway, walkway, patio or other similar surface, waves, including tidal wave and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;

        (2) Water below the surface of the ground, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure; or

        (3) Waterborne material carried or otherwise moved by any of the water referred to in **a.(1)** and **a.(2)** of this exclusion.

  b. This exclusion **2.**:

        (1) Applies regardless of whether any of the above, in **a.(1)** through **a.(3)**, is caused by an act of nature or is otherwise caused ; and

        (2) Applies to, but is not limited to, escape, overflow or discharge, for any reason, of water or waterborne material from a dam, levee, seawall or any other boundary or containment system.

  c. This exclusion does not apply to:

        (1) Direct loss by fire, explosion or theft to covered property that ensues from any of the above, in **a.(1)** through **a.(3)**; or

        (2) Personal property that is not at any residence an insured person owns, rents, occupies or controls.

Policy at Bates No. 36 (emphasis in original). This exclusion is modified by the "Flood/Surface Water Coverage Endorsement," which applies to 2.a.(1) above and adds back in coverage for floods. The Endorsement is discussed further below. Nonetheless, the exclusion for "*[w]ater below the surface of the ground*, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure" in 2.a.(2) remains. *Id.* (emphasis added). Unlike the Earth Movement exclusion, this exclusion applies to personal property that is located at a residence the insured person owns. *Id.* Therefore, when read with the lead-in ACC clause, this exclusion bars recovery for any losses of property or personal property at the insured's residence that is caused directly or indirectly by water under the surface of the ground.

Here there is a dispute of material fact as to whether the losses were caused by water under the surface of the ground, in which case they are excluded, or by surface water, in which case they are not excluded. Defendant argues that the water burst in a pipe below the ground and flowed under the house and through the foundation of the basement, and therefore was always water below the surface of the ground. There is some evidence in the record to support this theory. For

example, a video taken of the incident shows water flowing through holes in the basement wall. Video, ECF No. 27-6, Bates No. 225. Notes from Defendant's August 8, 2016 inspection report state:

> The pipe broke outside of foundation wall, but under the house. . . . It appears that water ran for weeks escaping under the slab. The water exited underground and into the residence. A large amount of water accumulated inside of the home and under the home (soil); this caused the hillside or cliff to subside. . . . This is a water front home that sits on a cliff overlooking Chesapeake Bay. This also could be a surface water issue but unlikely.

ECF No. 27-13, Bates No. 496. Defendant's adjuster, Mr. Blanch, stated in his deposition that he concluded the water was groundwater outside of the foundation because when he inspected the pipe he pulled it through the wall 12 to 18 inches. Deposition of David Blanch ("Blanch Depo."), ECF No 27-10 at 83:13–84:7, Bates No. 248. Mr. Blanch was also stated that he did not think the water was surface water:

> QUESTION: Water that came into the house through this broken pipe traveled through the house and exited through the exterior doors would be surface water, would it not?
>
> MR. ROSWELL: Objection.
>
> ANSWER: The water originated from under the ground from a broken pipe outside the foundation, so I would consider the source of the water groundwater. Broken pipe underground.
>
> QUESTION: So your answer would be it's not surface water?
>
> ANSWER: No.

*Id.* at 134:5–13, Bates No. 261; *see also id.* at 113:1–11, Bates No. 256; 120:2–10, Bates No. 257. And Plaintiffs' expert, Mr. Schoenwolf, stated in his deposition that the pipe that broke was "probably about 24, 30 inches" below ground and "could be a little deeper depending on the basement." Schoenwolf Depo. at 56:20–57:6, Bates Nos. 401–02. In sum, this portion of the

record indicates that the pipe that burst was underground and the water flowed underground, causing the cliff to fail.

However, Plaintiffs argue that the pipe broke within the basement wall and that the water flowed into the basement and out the back door, constituting surface water. There is some evidence in the record to support this theory as well. For example, Mr. Schoenwolf's expert report concludes:

> Based on our review of the available documents, videos and photographs, it appears that the most likely cause of the loss was the broken water main (plumbing line) which broke where it enters the home on its west side through a CMU wall. The video documentation shows a steady stream of clear water flowing into the home through the annulus between the water pipe and the PVC sleeve through the CMU wall. It is my opinion, based upon my review of the documents, and based upon my education and training that the plumbing line most likely broke within the CMU wall. If the pipe had broken outside of the wall, the pressure and flow of the water would have caused soil to flow into the basement with the water.

ECF No. 27-5 at 2, Bates No. 220. During his deposition, Mr. Schoenwolf explained the basis for his view that pipe broke inside of the wall and that the water flowed directly into the basement.

> QUESTION: What documents led you to believe that the plumbing line most likely broke within the CMU wall?
>
> ANSWER: Well, I guess I'm – to pick up on your common versus uncommon theme, in this particular case, I'm assuming that the sleeve is within the CMU block. And if the waterline had broken outside, it would have brought in with it soil. Usually, when a pipe breaks, water flows, and it will start to erode the soil, similar to the way it eroded the cliff. You know, water has a tendency to bring soil with it. Okay? So if that was the case, two things would have happened. You would have had a sinkhole on the outside because, as you lose that soil, the ground will settle; and when the ground settles, you get a sinkhole at the top. To Wiss, Janney, when they visited the site, there's no documentation on their report about a sinkhole at the ground surface. The videos didn't show any soil on the inside. Usually what happens is – I'm sure you've seen this in a pipe break in the street – you get water flowing out, and what happens? You get all kinds of soil and mud and stuff on the street that kind of mounds up and runs down. There was no observable – readily observable water – I'm sorry, soil on the floor of the basement. If it had broken outside the wall and it carried all that soil with it, there would have been extremes

of mud on the floor of the basement.  And in the videos I saw, there was no mud on
the floor.

Schoenwolf Depo., 27-10 at 52:5–53:14, Bates No. 401.  Mr. Schoenwolf then explained the basis

for his opinion that the water flowed directly out of the basement via the back doors:

> QUESTION: Do you have any opinions as to where the water was flowing out of
> the house?
>
> ANSWER: What I understand was the water was flowing out the back of the house
> at the lowest level.  And I'm assuming, you know, when you have basements, you
> know, the floor slabs are cast up against the wall.  There's a joint there, so I imagine
> the water was seeping into those and then out the back as well.
>
> QUESTION: So when you say out the back, is it – was there – was it coming out
> of the back door, or was it coming out from under the property?
>
> ANSWER: I think it was the back door.  At least that's what people – I mean, that's
> what people visually saw, but then I think there was documentation that, after the
> slope failed, people could see water seeping out of the slope.
>
> QUESTION: Okay. Did that – is there any influencing on whether the water was
> coming out of the door versus out of the slope?  Does that make a difference one
> way or the other, in your opinion?
>
> MR. LAWSON: Objection. Vague.
>
> ANSWER: Well, I mean, the difference is that the water is flowing out the door
> into the soil – through the soil and out the slope which causes the soil to reduce its
> shear strength and causes the slope failure.

Schoenwolf Depo. at 116:13–117:18, Bates No. 417–18.  Notes from Defendant's inspection

report acknowledge the water damage in the basement.  ECF No. 27-13, Bates No. 496 ("The

content on the basement level appear to be total loss from the water damage and or mold.  The

furnishings on the upper floors are ok and need to be moved out.")  Therefore this portion of the

record indicates that at least some portion of the water entered into the basement and may have

flowed directly out of the back door.

 In sum, it is undisputed that a pipe that was buried underground burst, releasing a

significant amount of water, and that some of that water flowed into the basement.  It is disputed

whether the pipe burst in the wall or outside the foundation. This is relevant to whether the water can be considered "[w]ater below the surface of the ground" that "seeps, leaks or flows through a building . . . [or] foundation." Policy at Bates No. 36. It is also disputed whether all of the water flowed into the basement or out the back door, or whether a portion of that water flowed underneath the house, and, if so, whether that was a cause of the slope failure. This is relevant to whether the slope failure was caused in whole or part by water under the surface of the ground, or caused entirely by surface water that flowed out of the house. Therefore, the cross-motions for summary judgment regarding the applicability of the Flood Or Surface Water exclusion are denied.

Thus, considering the Dwelling Coverage as a whole, Plaintiffs are unable to recover for their property losses because of the applicability of the Earth Movement exclusion. The Plaintiffs may be able to recover their personal property losses, but whether these losses are excluded based on the Flood Or Surface Water exclusion is an issue for trial.

### c. Special Exception Rule for Escaping Water

The Policy includes a "Special Exception Rule for Escaping Water." That rule appears directly after the section "Losses We Do Not Cover" that lists the 28 exclusions from coverage. The Special Exception Rule for Escaping Water states:

> If any of the causes of loss as described in Exclusions **11.** Gradual Deterioration, **13.** Pollution Or Contamination, **18.** Structural Movement, or **20.** Loss By Animals, cause water to escape from within a household appliance, or plumbing, heating, or air conditioning system, we cover the loss caused by the water. We provide this coverage unless an exclusion applies other than Exclusions **11.** Gradual Deterioration, **13.** Pollution Or Contamination, **18.** Structural Movement, or **20.** Loss By Animals. We do not cover loss to the household appliance, or plumbing, heating, or air conditioning system.

Policy at Bates No. 40 (emphasis in original). In other words, for four of the 28 excluded losses, an exception is made for losses caused by escaping water.

Plaintiffs argue that the losses here were caused by gradual deterioration of the pipe, and therefore that they should be entitled to recover for these losses. Defendant disputes that the cause of the loss was from gradual decay of the pipe, and in any event that the exclusions for Earth Movement and Floor Or Surface Water still apply.

The plain language of the Special Exception Rule for Escaping Water indicates that it only applies to four of the 28 exclusions: Gradual Deterioration, Pollution Or Contamination, Structural Movement, or Loss by Animals. It expressly states, "We provide this coverage unless an exclusion applies other than" these four exclusions. This means that it does not modify the Earth Movement or Flood Or Surface Water exclusions or the 22 other exclusions in the Policy. Therefore, for the reasons stated above, the Earth Movement exclusion bars recovery under this provision for property losses. The Flood Or Surface Water exclusion may bar recovery for personal property losses under this provision, but that is an issue for trial.

In addition, there is a dispute of material fact whether the loss was caused by gradual deterioration of the pipe. To support their claim that the pipe burst because of gradual deterioration, and hence caused the loss, Plaintiffs cite to the report and affidavit of their expert, Mr. Schoenwolf, and the deposition of the Defendant's adjuster, Mr. Blanch. Mr. Schoenwolf's report states:

> *The definitive cause of the plumbing line break is unknown* as we have not seen any photos, videos or descriptions of what the plumbing line break looked like. However, since there was no reported construction activity either inside or outside of the home in the area of the break immediately prior to the break, and the air temperatures were above freezing, *the most likely cause of the plumbing line break was wear and tear and decay of the pipe*.

Schoenwolf Report at Bates No. 220 (emphasis added). Similarly, Mr. Schoenwolf stated in a sworn affidavit, submitted as an exhibit to Plaintiffs' final reply brief on the cross-motions for summary judgment, as follows:

> In my opinion, *the definitive cause of the plumbing line break is unknown* as we have not seen any photos, videos or descriptions of what the plumbing line breack looked like. However, to a reasonable degree of certainty, it is my opinion that, since there was no reported construction activity either inside or outside of the home in the area of the break immediately prior to the break, and the air temperatures were above freezing, *the most likely cause of the plumbing line break was wear and tear and decay/deterioration of the pipe*.

Affidavit of David Schoenwolf, ECF No. 33-1 at 2 (emphasis added).

Defendant's October 4, 2016 letter denying the Plaintiffs' insurance claims cited the exclusion for Gradual Deterioration as one of the reasons for denial. ECF No. 27-20 at 2, Bates No. 533. When asked about this in his deposition, Mr. Blanch stated that this denial was based on the pipe deteriorating:

> QUESTION: Gradual deterioration is found in your denial but not in your reservation of rights. Tell me what it is that gradually deteriorated that caused you to put an exclusion for gradual deterioration in your denial letter. Was this the water pipe that gradually deteriorated and broke? Is that the gradual deterioration you're talking about?
>
> ANSWER: Gradual deterioration I was talking about would have been the pipe. *I had to assume, because we never got to inspect the pipe*, what had happened, and the pipe being 20 or 25 years old – I can't recall how old it was – burst because of some reason or broke because of some reason. *So one of those possible reasons was gradual deterioration*.

Blanch Depo., ECF No. 27-7 at 158:13–159:7, Bates No. 267.

However, Defendant cites to Mr. Schoenwolf's deposition, portions of which indicate that he was unsure about the reason that the pipe burst. *See* Schoenwolf Depo. at 91:7–9, Bates No. 410 ("Q: Do you know how that material would have decayed? A: I have no idea."); *id.* at 94:7–12, Bates No. 411 ("Q: [D]oes your training and experience give you any opinion whatsoever as to what would have caused this pipe to decay? A: Not without knowing what kind of pipe it is."); *id.* at 159:12–17 ("Q: Do you have reason to believe that the pipe here burst? A: Versus what? Q: Versus corrode or decay or wear and tear? A: I have no knowledge what happened to the pipe, why it was leaking, what caused it to leak.")

Thus the record demonstrates that there is uncertainty as to the reason the water escaped the pipe. Accordingly, whether the pipe burst because of gradual deterioration such that the Plaintiffs may recover for personal property losses under the Special Exception Rule for Escaping Water is an issue for trial.

Here I also address Defendant's Motion to Strike the Affidavit of David Schoenwolf. ECF No. 35. In its Opposition to Plaintiffs' cross-motion for summary judgment, Defendant disputed Plaintiffs' description of Mr. Schoenwolf's expert report as "testimony." ECF No. 30 at 3 ("This statement is not testimony. Testimony is given under oath. Fed. R. Evid. 603 ('Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience.')"). In their Reply, Plaintiffs' attached a sworn affidavit from Mr. Schoenwolf in which he states essentially the same thing that he said in his expert report, thereby making his statement "testimony". Defendant moved to strike the affidavit, arguing that it is a sham affidavit that contradicts Mr. Schoenwolf's previous sworn testimony in his deposition in order to create a dispute of material fact. ECF No. 35 at 1–2. Defendant also argues that the affidavit is improper to the extent that it purports to render an expert opinion given for the first time after discovery and the time for disclosing expert opinions has passed. As such, Defendant says that it is unfairly prejudiced because it does not have a meaningful way to rebut the opinion.

The relevant portion of Mr. Schoenwolf's affidavit is nearly identical to the opinion he expressed in his expert report. The record demonstrates that the affidavit was not filed for an improper purpose, but rather to offer the same statement Mr. Schoenwolf already made in the form of "testimony" to rebut Defendant's attack. And while portions of Mr. Schoenwolf's transcript indicate uncertainty as to the how the pipe would have decayed, this does not make the affidavit a

"sham affidavit."  Rather, this simply presents a dispute about which a jury will be able to assess Mr. Schoenwolf's credibility.  Indeed, this question of material fact as to whether the pipe decayed would exist even without the affidavit, given Mr. Schoenwolf's expert report and deposition. Moreover, Defendant is in no way prejudiced by this affidavit, as it is nearly identical with Mr. Schoenwolf's expert report and is consistent with their own denial letter and the deposition of their adjuster, Mr. Blanch.

Thus, Defendant's Motion to Strike the Affidavit of David Schoenwolf is denied.  As to the Special Exception Rule for Escaping Water, Defendant is entitled to summary judgment on claims for property losses because the Earth Movement exclusion applies.  There are two disputes of material fact for trial as to whether Plaintiffs can recover for personal property loss under the Special Exception Rule for Escaping Water: whether the Flood Or Surface Water exclusion applies and whether the cause of the loss was gradual deterioration of the pipe.

### d.  Extra Benefits for Land Restoration and Collapse

The Policy's "Home Declarations" contains coverage limits for the Property including $625,000 for dwelling coverage, $125,000 for other structures, and $437,000 for personal property.  Policy at Bates No. 12.  However, the Policy also contains a list of "Extra Benefits" that provides for additional coverage beyond the limits in the Declarations.  The Extra Benefits section states: "We will pay the following Extra Benefits *only when losses are covered by this policy*. These Extra Benefits are in addition to the limit of insurance specified in the Declarations for the property where the loss occurs, unless noted otherwise.  All deductibles apply unless noted otherwise."  Policy at Bates No. 25 (emphasis added).  This introductory clause is followed by a list of 31 categories of Extra Benefits for which Defendant will pay additional coverage beyond the limits in the Declarations, including, for example, payment for living expenses elsewhere due

to loss of use of the property, payment for the fair rental value of the property if the property is being rented, and mortgage expenses if a total loss of the property occurs.

The two categories of extra benefits that are disputed here are for "Land Restoration" and "Collapse."  For these Extra Benefits, the Policy states as follows:

**5. Land Restoration**
We will pay up to $10,000 or 10% of the covered property loss to the residence or other structure, whichever is greater, for costs required to replace, rebuild, stabilize or restore the land necessary to support the residence or other structure where the loss occurs.

**6. Collapse**
**a.** With respect to this Extra Benefit:
> **(1)** *Collapse* means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.
> **(2)** A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of *collapse.*
> **(3)** A part of a building that is standing is not considered to be in a state of *collapse* even if it has separated from another part of the building.
> **(4)** A building or any part of a building that is standing is not considered to be in a state of *collapse* even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**b.** We insure for direct physical loss to covered property involving *collapse* of a building or any part of a building if the *collapse* was caused only by one or more of the following:
> **(1)** Decay that is hidden from view, unless the presence of such decay is known to an *insured person* prior to *collapse*;
> **(2)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an *insured person* prior to *collapse*;
> **(3)** Weight of contents, equipment, animals or people;
> **(4)** Weight of rain or snow which collects on a roof ;
> **(5)** Use of defective material or methods in construction, remodeling or renovation if the *collapse* occurs during the course of the construction, remodeling or renovation; or
> **(6)** Any other cause of loss not excluded in Losses We Do Not Cover.

**c.** Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under **b.(1)** through **(6)** above, unless the loss is a direct result of the *collapse* of a building or any part of a building.

Policy at Bates No. 27 (emphasis in original).

Plaintiffs argue that the Extra Benefits are not subject to ACC clause exclusions because that would render these benefits illusory. ECF No. 27 at 25. To support their position, Plaintiffs cite to *Gov't Employees Ins. Co. v. DeJames*, in which the Maryland Court of Appeals held that an insurance policy's earth movement exclusion did not apply to a collapse caused by normal pressure or settling of the ground. 261 A.2d 747, 752 (1970). Plaintiffs also argue that any event that would invoke the need for the Land Restoration extra benefit would necessarily involve earth movement, and therefore the Earth Movement exclusion cannot apply.

The plain language of the Policy is unambiguous. The Extra Benefits apply "*only when losses are covered by this policy*." Policy at Bates No. 25 (emphasis added). Similarly, the Collapse Extra Benefit reiterates that it applies only to six enumerated causes of loss including "[a]ny other cause of loss *not excluded in Losses We Do Not Cover." Id.* (emphasis added). In other words, the Earth Movement and Flood Or Surface Water exclusions still apply when assessing any benefits provided by the Extra Benefits section. *DeJames* provides no support for the contrary. In that case, the Maryland Court of Appeals found that the Earth Movement exclusion in the insurance contract before it only applied to "unusual" movement of the earth, and not to "normal pressure or settling," which was at issue there, and therefore did not exclude collapse coverage. *DeJames*, 261 A.2d 747, 752 (1970). The Court did not make any statements regarding the applicability of the Earth Movement or other exclusions to Extra Benefits more generally. Here there is no question that Earth Movement occurred. Therefore, for the reasons discussed above, the Earth Movement exclusion bars recovery for any Extra Benefits.

This leaves only the potential recovery for Extra Benefits related to losses for personal property. As noted above, there is a dispute of material fact as to whether the Flood Or Surface Water exclusion applies, which could exclude recovery for any Extra Benefits for personal

property loss as well. Aside from this, Plaintiff cannot recover for personal property losses under the Land Restoration Extra Benefit, and there are questions of material fact as to whether Plaintiffs can recover for personal property losses under the Collapse Extra Benefit.

The plain language of the Land Restoration Extra Benefit does not include any additional coverage for personal property claims beyond that included in the Declarations. It provides benefits in the amount of "up to $10,000 or 10% of the covered property loss to the residence or other structure, whichever is greater" to restore land. Policy at Bates No. 27. But because the property loss to the residence or other structure is barred by the Earth Movement exclusion, there are no benefits for land restoration that would apply to personal property losses.

As to the Collapse Extra Benefit, there are several questions of material fact as to whether Plaintiffs can recover for personal property losses. First, there is a question as to what portion of the building "collapsed." Plaintiffs argue that the entire building was in state of collapse. Defendant argues that the building did not collapse at all. Based on the record, there is a disputed question as to whether *part* of the building collapsed. Plaintiffs' Exhibit 32, below, illustrates that at least a portion of the back part of the building cracked, including the foundation, and was hanging over the cliff.



ECF No. 27-32, Bates No. 686.  As quoted above, the definition of "collapse" in the Policy contains four parts.  Under the first part, "*Collapse* means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose."  Here at least part of the building at the back of the house near the foundation broke away from the house.  And the entire building was deemed unfit for use by Calvert County.  This suggests that either part of the building or the entire building could be considered in a state of collapse.

However, the Policy goes on to clarify that "A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of *collapse*."  Further, "A part of a building that is standing is not considered to be in a state of *collapse* even if it has separated from another part of the building."  And finally, "A building or any part of a building that is standing is not considered to be in a state of *collapse* even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion."  Therefore the portions of the building which are standing – which appear to be almost the entirety of the building, are not in a state of

collapse. But this does leave the portion of the building that fell away from the building to be considered in a state of collapse. The extent of that portion of the building that collapsed is a question for the jury to determine. The jury may also consider whether that portion of the building was entirely the foundation of the building, and is therefore excluded by the last clause of the Collapse Extra Benefit, which states, "Loss to a[] . . . foundation . . . is not included [as a covered cause of loss], unless the loss is a direct result of the *collapse* of a building or any part of a building." Policy at Bates No. 27 (emphasis in original).

Next, there is a question whether that collapse was caused by "decay." The Collapse Extra Benefit applies in relevant part when the collapse was caused by "Decay that is hidden from view, unless the presence of such decay is known to an *insured person* prior to *collapse*." Policy at Bates No. 27 (emphasis in original). As discussed above, there is a question of material fact as to how the pipe burst and whether that was due to gradual deterioration or decay. This is a question for the jury to determine.

Finally, assuming that a portion of the building did collapse, and that collapse was caused by decay, it is unclear from the record whether Plaintiffs suffered "direct physical loss" to personal property as a result of the collapse of that portion of the building. *Id.* Any recover under the Collapse Extra Benefit would be limited to these losses.

In sum, the Earth Movement exclusion applies to the Extra Benefits, barring any recovery for damage to the Property. The Land Restoration Extra Benefit provides no additional coverage for personal property. And there are several questions of material fact as to whether there could be recovery for direct physical loss to personal property as a result of a portion of the building collapsing.

### e. Flood/Surface Water Coverage Endorsement

Finally, Plaintiffs argue that the Flood/Surface Water Coverage Endorsement entitles them to relief. This Endorsement provides an additional Extra Benefit for flood coverage. Policy at Bates No. 71 ("The following Extra Benefit is added: Flood/Surface Water Coverage. We will pay for physical loss or damage to your residence, personal property or other structures, including debris removal, caused directly by *flood*.) The Extra Benefits provided by the Endorsement include, for example, paying the lesser of the $250,000 or the limit in the Declarations for damage to residential property, the lesser of $100,000 or the limit in the Declarations for damage to personal property, and $75,000 for costs due to the enforcement of any ordinance requiring the demolition of a building damaged by flood. Policy at Bates No. 71–72. The Endorsement specifically notes, "With respect to coverage provided by this endorsement, the provisions of the policy apply unless modified by the endorsement." Policy at Bates No. 71. Given that it adds coverage for losses caused by flood that were excluded by the Flood Or Surface Water exclusion in the main policy, the Endorsement makes clear that the "Flood Or Surface Water [exclusion] does not apply to the extent coverage is provided in this Flood/Surface Water Coverage endorsement." Policy at Bates No. 72. In other words, the Endorsement provides specific extra benefits for losses from floods, but losses from water under the surface of the ground remain excluded.

Under a heading "Losses We Do Not Cover" the Endorsement provides two additional exclusions:

> The following exclusions are added:
> **1. Flood Already In Progress**
> We do not cover any loss or damage caused by or resulting from any *flood* that is already in progress at the time and date:
> **a.** The policy term begins; or
> **b.** Coverage is added at your request.

If the *flood* is due to the overflow of inland or tidal waters, then the *flood* is considered to begin when the water first overflows its banks.

**2. Earth Movement**

We do not cover any loss or damage caused by or resulting from earth movement, such as *landslide*, slope failure, or a saturated soil mass moving by liquidity down a slope whether caused directly or indirectly by *flood.*

Policy at Bates Nos. 72–73 (emphasis in original). In other words, although the Endorsement adds back benefits for losses caused by flood, it does not cover floods that are already in progress or earth movement caused by a flood.

Plaintiffs argues that the Endorsement is not covered by the ACC clause, such that the extra benefits it provides are not excluded by the main policy's Earth Movement exclusion. To support this position, Plaintiffs state the same arguments as described above that applying the ACC clause to these extra benefits would render them "illusory." Further Plaintiffs argue that the Earth Movement exclusion in the main policy was amended by a narrower Earth Movement exclusion in the endorsement that is not subject to an ACC clause.

The plain language of the Endorsement states, "With respect to coverage provided by this endorsement, the provisions of the policy apply unless modified by the endorsement." Policy at Bates No. 71. The Endorsement does not contain any language that modifies the ACC clause in the main policy that precedes the Exclusions. Therefore the ACC clause applies to any exclusions in the main policy or those added to the list of exclusions by the Endorsement.

Therefore the Earth Movement exclusions in the main policy and the Endorsement bar recovery here for losses to the property due to flooding. Unlike the Flood or Surface Water exclusion, which the Endorsement states "does not apply to the extent coverage is provided in [the] Flood/Surface Water Coverage endorsement," the Endorsement does not say that the Earth Movement exclusion does not apply. Instead, it says that two exclusions are "added," including one for Earth Movement caused by a flood. The word "added" makes it unambiguous that the

Policy does not remove or replace the existing Earth Movement exclusion, it simply adds additional exclusions. Indeed, the exclusions work to reduce ambiguity by clarifying that losses from Earth Movement caused by floods are not covered, despite the fact that flood coverage is added back to the Policy.

But even if the Earth Movement exclusion in the Endorsement were to be construed as replacing the main policy's earth movement exclusion for the purposes of flood coverage, the result would be the same as the Endorsement does not modify the ACC clause that applies to all exclusions under the heading "Losses We Do Not Cover." And in this respect the Earth Movement exclusion in the Endorsement is even stronger in some ways than the Earth Movement exclusion in the main policy because it applies to "any loss or damage" from earth movement caused by a flood and therefore applies to personal property as well. Because there is a dispute of material fact as to whether a flood occurred, it is a question for the jury whether the Earth Movement exclusion in the Endorsement precludes personal property losses for earth movement resulting from a flood if any such losses exist.

Finally, as discussed above, the Endorsement does expressly modify the Flood Or Surface Water Exclusion to add coverage for floods. The result is that, given the exclusions above, the Plaintiffs may be able to recover for personal property losses caused by flood if those losses were not directly or indirectly caused by earth movement. And there is a question of material fact whether the water can be considered a flood or if it is water under the surface of the ground. This is a question for the jury.

In sum, the Earth Movement exclusions in the main policy and the Endorsement bar any recovery for damage to the property and Defendant is entitled to summary judgment on this ground. Plaintiffs may be able to recover for personal property losses caused by flood if a jury

determines that a flood occurred ant that they were not caused directly or indirectly by earth movement, but there are questions of material fact as to these claims that preclude summary judgment for either party.

## IV.    Conclusion

In sum, Defendant is entitled to summary judgment on Plaintiffs' claims for property damage as the Earth Movement exclusion applies to the property damage claims under all of Plaintiffs' alleged theories of recovery.  Neither party is entitled to summary judgment regarding Plaintiffs' personal property claims as disputed issues of material fact remain.  Specifically, the following claims must be decided at trial because their resolution depends upon the determination by the jury of material disputes of fact: (1) whether personal property losses were caused directly or indirectly by water under the surface of the ground (making them excluded by the Flood Or Surface Water Exclusion) or entirely by flood or surface water to allow for coverage under the Dwelling Coverage and Flood/Surface Water Endorsement and potentially under the Special Exception Rule for Escaping Water; (2) whether the pipe burst because of gradual deterioration or decay to potentially allow for coverage for personal property losses under the Special Exception Rule for Escaping Water and Collapse Extra Benefit; and (3) the extent of a partial collapse of the building, whether that collapse was entirely to the foundation of the building, and whether there was direct physical loss to personal property as a result of this partial collapse, to potentially allow for coverage under the Collapse Extra Benefit.

## **ORDER**

For the reasons stated above, it is, this 20th day of March, 2020, hereby ORDERED that:

1.  Defendant's Motion for Summary Judgment, ECF No. 24, is GRANTED IN PART AND DENIED IN PART as follows:

    a.  Summary Judgment is GRANTED in favor of Defendant and against Plaintiffs on Plaintiffs' claims for Property damage;

    b.  Summary Judgment is DENIED on Plaintiffs' claims for Personal Property damage;

2.  Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 27, is DENIED;

3.  Defendant's Motion to Strike Affidavit of David Schoenwolf, ECF No. 35, is DENIED;

4.  I will follow up at a later date to schedule a telephone conference with the parties to discuss further pre-trial proceedings.

_____/S/_____
Paul W. Grimm
United States District Judge
